U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

2025 FEB 26  PM 12: 35

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

DALE CHAPPELL,

Defendant.

**CASE NO. 2:24-CR-00056 ― 1**

## MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE

Dale Chappell moves this Honorable Court for early termination of his supervised release. Since his release, he has fully reintegrated into society, built a successful business, and maintained financial and personal stability. Since supervised release is intended to support reintegration and not function as an indefinite restriction or punishment, the goals of supervision have been met. Early termination is now appropriate.

## SUMMARY OF THE CASE

On March 31, 2010, Chappell was indicted in the Middle District of Florida on charges related to possessing and distributing child sexual abuse materials (CSAM). He later pleaded guilty to one count, and on October 18, 2010, he was sentenced to 180 months in prison, followed by a lifetime term of supervised release.

While incarcerated, Chappell became a certified paralegal and a respected writer for a criminal law magazine, publishing over 400 articles on appeals and postconviction

relief. He also voluntarily completed both the Residential and Non-Residential Sex Offender Treatment Programs (SOTP-R and SOTP-NR), as well as both the Residential and Non-Residential Drug Abuse Programs (RDAP and NRDAP). After completing these programs, he remained in them as a mentor to other participants, continuing in SOTP-R as a mentor until his release. Throughout his incarceration, he maintained a spotless disciplinary record and was commended for assisting a staff member during an emergency.

Upon release, Chappell was required to return to Florida, despite having no support system or housing there. He secured a job as a paralegal with a law firm, but without stable housing, he was placed in a halfway house for six months. After his time there, he was released homeless, staying in motels for $1,000 a week, facing multiple evictions before finally securing a room in a boarding house for sex offenders in Orlando. During this period, he also returned to playing the piano, something he had once loved but lost interest in during his legal troubles in Florida.

Chappell had sought to relocate to Vermont before his release, as he had a few friends and a potential place to live, but the U.S. Probation Office in Vermont required proof of stability before approving his transfer, as he lacked community ties. After demonstrating stability through steady housing, employment, and long-term law-abiding behavior, jurisdiction over his supervision was transferred to the District of Vermont.

Having fully reintegrated, demonstrated sustained rehabilitation, and met all the goals of supervision, Chappell now seeks early termination, as continued oversight

2

serves no legitimate rehabilitative or function.

## ARGUMENT

### I. LEGAL AND POLICY FRAMEWORK FOR EARLY TERMINATION OF SUPERVISED RELEASE

The legal and policy framework governing early termination of supervised release has evolved significantly in recent years, emphasizing rehabilitation, reintegration, and individualized assessments rather than rigid formulas or punitive extensions of supervision. Courts now widely recognize that supervised release is not an additional punishment but rather a tool designed to assist in reintegration. Once it ceases to serve that function, continued supervision is unnecessary.

Under 18 U.S.C. § 3583(e)(1), the court has full discretion to grant early termination of supervised release after one year if it finds that termination is warranted by the individual's conduct and the interests of justice. In making this determination, the court considers only limited factors under 18 U.S.C. § 3553(a), as Congress deliberately excluded certain factors—such as the seriousness of the offense— from early termination decisions. *See United States v. Deroche*, 2024 U.S. Dist. LEXIS 201721, *3 (D. Idaho Nov. 4, 2024) (recognizing that Congress explicitly excluded offense seriousness from § 3583(e) consideration and that termination should be based on post-release conduct).

The Supreme Court acknowledged that once an individual has demonstrated successful reintegration and rehabilitation, continued supervision serves no purpose. *See United States v. Johnson*, 529 U.S. 694, 709 (2000) (stating that supervised release "fulfills rehabilitative ends, distinct from those served by incarceration"). This principle

has been further reinforced by amendments to the 2025 U.S. Sentencing Guidelines (U.S.S.G.) amendments, which introduce U.S.S.G. § 5D1.4, a new guideline explicitly addressing early termination of supervised release.

## A. A New Shift Toward Encouraging Early Termination

The 2025 U.S.S.G. amendments establish § 5D1.4,[1] which significantly changes how courts assess early termination. This new guideline rejects outdated judicial interpretations that required individuals to serve a set percentage of their supervision term before being considered for termination. It also eliminates the long-standing argument that "mere compliance isn't enough", recognizing that continued supervision should not be maintained when it no longer serves a rehabilitative or reintegration function. The text of § 5D1.4 provides:

**Modification, Early Termination, and Extension of Supervised Release (Policy Statement)**

(a) Modification of Conditions. At any time prior to the expiration or termination of the term of supervised release, the court [should][may] modify, reduce, or enlarge the conditions of supervised release whenever warranted by an individualized assessment of the appropriateness of existing conditions. *See* 18 U.S.C. § 3583(e)(2). The court is encouraged to conduct such an assessment as soon as practicable after the defendant's release from imprisonment.

(b) Early Termination. Any time after the expiration of one year of supervised release and after an individualized assessment of the need for ongoing supervision, the court [should][may] terminate the remaining term of supervision and discharge the defendant if the court determines, following consultation with the government and the probation officer, that the termination is warranted by the conduct of the defendant and the interest of justice. *See* 18 U.S.C. § 3583(e)(1).

---

[1] The proposed amendments can be found at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20250124_prelim_rf.pdf last accessed Feb. 20, 2025).

1) In determining whether termination is warranted, the court should consider the following non-exhaustive list of factors:
(1) Any history of court-reported violations over the term of supervision;
(2) The ability of the defendant to lawfully self-manage beyond the period of supervision;
(3) The defendant's substantial compliance with all conditions of supervision;
(4) The defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision;
(5) A demonstrated reduction in risk level over the period of supervision; and
(6) Whether termination will jeopardize public safety, as evidenced by the nature of the defendant's offense, the defendant's criminal history, the defendant's record while incarcerated, the defendant's efforts to reintegrate into the community and avoid recidivism, any statements or information provided by the victims of the offense, and other factors the court finds relevant.

The court is encouraged to conduct such assessments upon the expiration of one year of supervision and periodically throughout the term of supervision thereafter.

(c) Extending a Term of Supervised Release. The court may, at any time prior to the expiration or termination of a term of supervised release, extend the term of supervised release if less than the maximum authorized term of supervised release was previously imposed and the extension is warranted by an individualized assessment of the need for further supervision. *See* 18 U.S.C. § 3583(e)(2).

## B. Courts Have Rejected Using Offense Conduct or Arbitrary Time Frames to Justify Continued Supervision

The new guideline and judicial precedent emphasize that continued supervision

must be justified by an ongoing need, not simply by the original offense conduct.

Congress intentionally excluded § 3553(a)(2)(A)—which considers the seriousness of the

offense—from early termination decisions under § 3583(e). Courts have followed suit,

holding that:

- Supervised release is forward-looking, not backward-looking—it exists to ensure successful reintegration, not to extend punishment. *United States v. Cognetta*, 2024 U.S. Dist. LEXIS 90437, *4-5 (S.D.N.Y. May 17, 2024).

- Early termination should focus on an individual's post-release conduct, not their underlying conviction. *See Deroche*, 2024 U.S. Dist. LEXIS 201721 at *3.

- Time served on supervised release is not a valid reason to deny early termination—courts must make an individualized determination of whether supervision is still necessary. *See United States v. Pena*, 2025 U.S. Dist. LEXIS 22401, *7 (S.D.N.Y. Feb. 10, 2025).

Despite these well-established principles, some courts have historically relied on outdated rationales—such as requiring individuals to complete a certain amount of time of their supervision term or dismissing compliance as insufficient for early termination. These positions have now been squarely rejected by both case law and sentencing policy. *See United States v. Melvin*, 978 F.3d 49, 53 (3d Cir. 2020) (holding that early termination should not require "exceptional circumstances" and that supervision should not continue where it serves no rehabilitative function).

Additionally, previous rulings that suggested early termination should be reserved for only exceptional cases have been roundly criticized and rejected. Multiple circuits have since clarified that exceptional circumstances are not required for early termination. *See United States v. Hale*, 2025 U.S. App. LEXIS 2120 (6th Cir. Jan. 30, 2025) (granting early termination in an SO case over government objection, holding that requiring exceptional circumstances contradicts the statute and purpose of supervised release).

Supervised release is not intended to be an extended sentence or a mere formality. Instead, supervised release is designed to ensure a smooth reintegration into

society, and to provide assistance and oversight where needed. However, courts recognize that when an individual has fully reintegrated and supervision no longer serves a purpose, it should be terminated. *See, e.g., id.* (granting early termination in an SO case over government objection because continued supervision imposed unnecessary burdens rather than aiding reintegration).

Because Chappell has fully reintegrated into society, demonstrated sustained rehabilitation, and no longer requires correctional oversight, the only legally and factually justified outcome is the early termination of supervised release.

## II. SUPERVISED RELEASE HAS ACHIEVED ITS PURPOSE AND IS NO LONGER NECESSARY

Chappell's case is the ideal example of what supervised release is meant to accomplish. He has successfully reintegrated into society, established professional and personal stability, and demonstrated that continued supervision is both unnecessary and counterproductive. Courts have granted early termination under similar circumstances, finding that the individual had "achieved the intended goals of supervision." *See, e.g., United States v. Aybar*, 2024 U.S. Dist. LEXIS 211228, at *8 (E.D.N.Y. Nov. 20, 2024).

### A. Chappell's Successful Reintegration Into Society

Chappell's reintegration is not theoretical—it is fully realized. Since his release, he has built a life that is stable, fulfilling, and self-sustaining, meeting the purposes of supervised release. Significant evidence of his reintegration is his consulting firm, which has provided him with more than just financial security—it has given him purpose and hope, a reason to wake up every morning excited to work.

7

Unlike many individuals on supervised release who struggle to secure stable employment, Chappell took a different approach—he built a successful consulting firm that contracts with attorneys and their clients, providing guidance on postconviction relief, prison preparation, and successful reentry. He works with attorneys nationwide, including on high-profile cases, offering expert insight into postconviction strategies and preparing clients to navigate prison and life after release.

His firm is not just a job—it is a reflection of his lifelong passion for helping others, a passion that existed long before his incarceration.

- Before prison, he was a firefighter and paramedic for 20 years, dedicating himself to protecting and assisting others.[2]
- In prison, he became the head law clerk and a certified paralegal, helping fellow inmates navigate the complexities of the legal system, ensuring they had the best possible chance at securing relief.
- Now, he assists attorneys and their clients, using his lived experience and legal knowledge to help individuals successfully transition from prison back into society.

His business is thriving, and he has achieved full financial independence, allowing him to own a home in Vermont and live without being dependent on the government.[3] Financial and employment stability strongly support early termination.

However, Chappell's success is about far more than just money—it is about

---

[2] The government, in other filings in Chappell's case to discredit his character even further, has wrongly said that he was only a firefighter from 1998 to 2007, relying on one entry in the PSR about his employment with Clearwater Fire Department. This is wrong because Chappell worked for several departments for years prior to being employed by Clearwater, including NYC EMS, Pinellas County EMS, Manatee County EMS, Anna Maria Fire, Safety Harbor Fire, continuously advancing his career with each new department.

[3] Chappell entered into an agreement to buy a home in Rutland in December, which will be finalized after filing of taxes this year.

8

purpose.

### 1. A Deep, Internal Motivation That Ensures Long-Term Success

One of the strongest indicators that an individual will not return to crime is whether they have developed a deep internal motivation to remain on the right path. Internal motivators are a key factor in determining whether continued supervision is necessary. Chappell does not merely avoid reoffending because of external pressures or fear of consequences—he avoids it because he has something bigger to live for.

Many individuals on supervised release claim they will stay out of trouble because of their family, children, or relationships. While these are valid reasons, they are external motivators—factors outside their control that can change. If those external motivators disappear, the individual may struggle to find a reason to continue making the right choices. Internal motivators, however, are permanent and cannot be taken away.

For Chappell, his purpose is clear: helping people.[4] He wakes up every morning eager to get to work because he knows his efforts directly impact the lives of individuals trying to create a healthy life and reintegrate after prison.

He has dedicated his life to ensuring others have the support and guidance they need to succeed. He is not just working for financial gain—he is working because it fulfills him. This deep, internal sense of purpose is one of the strongest indicators that he is not a risk of reoffending. Individuals who have developed intrinsic motivation to

---

[4] Chappell wrote "Be Helpful!" on the covers of his numerous journals he kept in prison as a daily reminder of his purpose.

remain law-abiding do not require continued supervision. *See Aybar*, 2024 U.S. Dist. LEXIS at *8.

### 2. Responsibility and Compassion as Further Evidence of Stability

Beyond his professional success, Chappell's reintegration is further demonstrated by his deep sense of responsibility for others, both personally and professionally. After his release, he adopted and rehabilitated severely abused rescue dogs, personally covering all veterinary bills and providing them with long-term care.



Rocko spent the first year of life in a shelter learning to trust people after severe abuse.



Moose was abused his first year of life as well, being shot, stabbed, and burned with acid while starved in a cage in Mississippi, until a rescue brought him to Vermont.

An individual's ability to care for others, take on personal responsibility, and provide long-term stability further supports early termination.

Providing this level of care requires:

- Emotional stability, ensuring that he is capable of handling stress and responsibility.

10

- Financial stability, as the costs of rehabilitating abused animals are substantial.

- Long-term commitment, showing that he is thinking about the future, not just the present.

This level of personal responsibility further reinforces that Chappell does not need supervision to remain law-abiding—he has fully reintegrated into society and is thriving.

Chappell has done everything the justice system could ask of an individual on supervised release. He has:

- Built a thriving business that provides valuable assistance to others.

- Achieved financial and residential stability, eliminating any risk factors that supervision is meant to address.

- Developed an internal, self-sustaining motivation to remain on the right path, ensuring he will never reoffend.

- Demonstrated personal responsibility and long-term stability, taking on meaningful commitments beyond himself.[5]

Supervised release is intended to help individuals reintegrate—but when an individual has already reintegrated and supervision serves no rehabilitative or deterrent function, early termination is warranted.

## B. Completion of Intensive Rehabilitation and Treatment Programs

Chappell's case presents overwhelming evidence that he has not only completed the most rigorous treatment programs available but did so *voluntarily*.[6] His progress,

---

[5] As one of Chappell's mentors early in his prison sentence told him, "Create a positive impact that lives beyond your expiration date."

[6] All BOP treatment programs are voluntary. One statement by a person who had completed the SOTP-R particularly struck Chappell: "If you want someone to give you a second chance, you have to give them a reason."

11

however, was hindered by BOP incompetence and lack of assistance by staff. He got nearly zero help from the BOP in receiving any treatment. He was successful in treatment despite the BOP's lack of any support. Each obstacle he had to overcome is explained within the text below.

### 1. Additional Completion of the Non-Residential Sex Offender Treatment Program (SOTP-NR)

After pestering the psychology staff at Marianna for five years, Chappell voluntarily enrolled in the Non-Residential Sex Offender Treatment Program (SOTP-NR). This was supposed to be a nine-month program but became much longer due to what staff called "institutional interference." This included staff meetings in the room where the treatment group was held, so it would be cancelled for that week. This occurred so frequently that program participants filed grievances with the BOP, which were all ignored.

After 26 months in the SOTP-NR, Chappell was called back to court for a hearing. While he was assured by staff he could continue the program when he came back, staff told him upon his return that he missed too many classes (only 4 out of more than 100) and would have to start over. This was a hugely disappointing setback, but Chappell re-enrolled in the next SOTP-NR, not deterred by staff's false promises.

Unlike many individuals who complete one program and consider their rehabilitation finished, he saw the value in additional treatment and pursued it with all he had.[7]

---

[7] In Florida, Chappell experienced a mental health crisis and sought permission from his PO to use his health insurance's telehealth service in the PO's office to speak with a psychiatrist when he could not

12

## 2. Completion of the Residential Drug Abuse Program (RDAP)

After SOTP-NR, Chappell was convinced by staff that he should continue his treatment efforts by enrolling in the Residential Drug Abuse Program (RDAP), the Bureau of Prisons' most intensive, full-time, nine-month substance abuse treatment program. RDAP is a therapeutic community-based program, requiring daily therapy and cognitive restructuring exercises. He agreed and was transferred to FCI Seagoville in Texas in mid-summer with temperatures well over 100° for days on end.

Chappell excelled in RDAP, becoming a tutor and mentor, and an overall respected member of the community, despite his SO label, something uncommon among non-SOs in the BOP. It was in RDAP at FCI Seagoville where he learned to "get comfortable being uncomfortable." This was where he learned that being uncomfortable in treatment meant that big changes were happening. It was revealing and fascinating to him, especially after chasing any coping skill that would get rid of discomfort quickly, even if it was unhealthy – or illegal. This was where he began adopting healthy coping skills and realized that he liked who he was becoming.

After completing RDAP, Chappell asked for a "program completion transfer" to FMC Devens for the residential sex offender treatment program (SOTP-R). A fellow mentor in RDAP convinced Chappell that if he liked the challenge of RDAP, he would love the intensity of SOTP-R.[8] He jumped at the chance to grow even further.

---

obtain an in-person appointment. The PO denied this request, as Florida USPO's zero-internet policy applied without exception, even for essential medical care. With no access to treatment, Chappell relied on coping strategies learned in SOTP-R, including mindfulness, cognitive restructuring, and emotional regulation, to manage the crisis on his own.

[8] This friend spent hours and hours with Chappell explaining the SOTP-R program since he had completed it himself. It was rare to find anyone who had anything good to say about the SOTP-R because

Notably, since his release, Chappell has remained completely clean, passing over 100 drug tests without a single issue. Chappell also completed the post-release portion of RDAP while in the halfway house. Recognizing his perfect record, his probation officer has already excused him from most drug testing. Courts have ruled that when probation officers scale back oversight due to demonstrated success, early termination is warranted.

### 3. Completion of the SOTP-R

The SOTP-R is the most intensive SO treatment program offered by the Bureau of Prisons—arguably the most intense in the country.[9] It requires full-time immersion in a structured treatment environment, with daily cognitive-behavioral therapy, risk assessment, and relapse prevention planning. Unlike non-residential treatment, SOTP-R participants live in a therapeutic community setting, where they undergo constant evaluation and intervention by a team of psychologists who have offices within the residential part of the building, so they are constantly interacting with the 60 or so participants.

The program's completion rate is notoriously low—statistics show that four out of five participants fail to complete SOTP-R because of its difficulty and the emotional commitment it requires. Many drop out rather than engage in the deep self-

---

so many people failed and dropped out. The common description of the program was that it was designed to civilly commit people. Chappell was smarter than that and realized that treatment could actually reduce someone's risk level, rather than increase it to lead to civil commitment. He would later find out that studies have proven this time and again – not to mention that he has seen how treatment has taught him skills to deal with any situation where reoffending might be a possibility.

[9] *See United States v. C.R.*, 792 F. Supp. 2d 343 (E.D.N.Y. 2011) (Judge Weinstein visited the SOTP-R at Devens and filed a detailed report on what he found, intimately describing the program's intensity).

examination the program demands.[10] Despite these challenges, Chappell fully committed to the process and successfully graduated.

During SOTP-R, he:

- Created 144 "life goals" that had to be approved by the entire staff, which took several months to complete.

- Did a complete personal inventory, including a detailed sexual history that was presented to staff to identify patterns that led up to his offense conduct.

- Presented the full cycle of offending (called the "Process of Acting Out") to the treatment community, explaining the triggers and interventions that he could have used to break the offense cycle. The community then offered suggestions on further interventions that could be implemented.

- Was asked by the program director to lead the orientation of new participants coming into the unit.

- Completed three years of full-time cognitive-behavioral therapy, addressing distorted thinking patterns and risk factors.

- Developed a comprehensive relapse prevention plan, reviewed and approved by a panel of psychologists before graduation.

- Stayed in the program as a mentor to other participants after completion.

Unlike some individuals who simply go through the motions to check off a requirement, Chappell fully embraced the program's goals. He recognized that external motivators—such as the fear of legal consequences—are not enough to prevent future risk.[11] Instead, he focused on developing internal motivators, such as integrity, accountability, and a deep personal commitment to never creating another victim,

---

[10] Staff recognized that Chappell was struggling with the emotional challenges of the program and suggested he take extra treatment programs to handle these difficulties. He chose to take extra programs, instead of dropping out, and went on to mentor others through these same programs.

[11] As Chappell would tell program participants, "You knew you would go to prison if caught, so your 'I don't wanna go back to prison' reason for not reoffending is weak." Instead, he encouraged them to find the internal motivator that would drive them to do the right thing when no one is watching, often defined as *integrity*.

15

directly or indirectly.[12][13]

### 4. Additional Completion of the Non-Residential Drug Abuse Program (NRDAP)

Even after completing RDAP, Chappell voluntarily enrolled in the Non-Residential Drug Abuse Program (NRDAP) at FMC Devens at the request of treatment staff. The program coordinator specifically asked him to serve as a mentor and assist other participants due to his prior success in RDAP.

### 5. The Ongoing Issues with Current Treatment Requirements

Despite completing every available treatment program, Chappell is still required to attend SO treatment on supervised release, simply because his conditions state that he must "participate" in an approved treatment program and do not say anything about completing such treatment. When he informed his probation officer in Florida that he had already completed SOTP-R, the PO dismissed it, stating that treatment completed in prison does not count.[14]

But this directly contradicts the goals of supervised release, which are meant to ensure that individuals receive necessary rehabilitative support—not force unnecessary treatment on those who have already completed it.

In Vermont, Chappell's probation officer has repeatedly recognized what he

---

[12] "No more victims" was the motto of the SOTP-R. Victims include more than just the direct victims of sexual abuse but can also be extended to victims of a person's abusive behavior other than sexual abuse, such as verbal abuse and using anger to control someone, for example.

[13] There was a sign on the wall in the program that said, "The best apology is changed behavior." This stuck with Chappell and pushed him to change so to offer an apology of sorts to those he had harmed.

[14] The treatment provider in Florida also stated that a person never completes sex offender treatment in her program, and there were participants in the group who had been there for several years, some as long as nine years.

16

brings to the group and has described him as a "leader" who challenges others to engage with treatment. While this acknowledgment highlights his growth and leadership, it also raises a critical issue: He is not kept in treatment because he needs it—he is in treatment because others benefit from his experience. This is frustrating because Chappell is not growing in treatment. In fact, treatment requires that he take off half a day on Monday, the busiest day of the week for his business, to attend group. Then it requires him to attend a separate bi-weekly session.

Beyond the issue of unnecessary treatment, a financial burden is unfairly imposed on him. His supervised release conditions require a copayment for treatment, which his provider interprets as any amount not covered by insurance. Because his insurance does not cover the full cost, he has been billed thousands of dollars, while most others in the program receive full funding from the U.S. Probation Office because they lack insurance. His probation officer acknowledged this disparity but stated he has no control over it. Chappell is effectively being penalized for being responsible and having insurance. This financial burden is unnecessary and unfair, particularly when:

Chappell has fully completed every major treatment program available and has exceeded expectations by voluntarily engaging in additional rehabilitation. His mandatory participation in SO treatment under supervised release is not based on need but on bureaucratic requirements and provider financial interests. Given his treatment history, continued supervision and treatment are unnecessary and should be terminated.

17

## C. No Public Safety Risk and No Need for Continued Supervision

Supervised release is also intended to ensure public safety and provide structure to those who require oversight. However, when an individual has demonstrated long-term stability, law-abiding behavior, and a commitment to rehabilitation, further supervision is unnecessary. *See United States v. Ponce*, 22 F.4th 1045, 1047 (9th Cir. 2022) (holding that courts should terminate supervision when it no longer serves a rehabilitative or deterrent function).

### 1. Long-Term Stability and Law-Abiding Behavior

Since his release, Chappell has maintained a perfect record with no violations, infractions, or negative contact with law enforcement. He has never failed to meet a supervision requirement, has adhered to all conditions imposed by the court, and has remained fully engaged in productive, law-abiding activities. Individuals who have demonstrated long-term stability with no violations should be granted early termination.

Supervised release is intended to address individuals who require structured oversight to remain law-abiding. Chappell has demonstrated through his actions that he does not need continued supervision to remain compliant with the law.

Further evidence of the unjustified and excessive nature of supervision comes from Chappell's experience with overly restrictive and punitive internet restrictions in Florida, which went far beyond what was necessary to ensure compliance. In Florida, Chappell disclosed during a polygraph interview that his Gabb non-internet phone, which had been approved by USPO, automatically accessed an email gateway to send

18

and receive text messages, a default function of all phones. Despite this being a USPO-approved device, and despite having no access to the internet, Florida USPO seized the phone and sent it to the FBI for forensic analysis, where it remained for two months. After finding no violation, the phone was returned to Chappell, still sealed in an evidence bag.

This extreme and unnecessary level of scrutiny demonstrates that the government's supervision was not about assessing actual risk or ensuring public safety, but rather about imposing arbitrary restrictions regardless of the facts. This was further reinforced when Florida USPO denied Chappell access to telehealth services, even when he was experiencing a mental health crisis and sought permission to use his health insurance's telehealth option at the PO's office to speak with a psychiatrist. The PO refused, stating that Florida USPO prohibits all internet access, regardless of the circumstances. This forced Chappell to rely solely on the coping mechanisms he learned in SOTP-R, despite the fact that a legitimate mental health service was readily available but blocked due to overly rigid supervision conditions.

Since transferring to Vermont, Chappell has had monitored internet access without any issues, proving that the prior restrictions were unnecessary and not based on actual risk. The disparity between districts further highlights that supervision conditions are not necessarily tied to individual risk assessments but are instead imposed arbitrarily, reinforcing that continued supervision serves no public safety or rehabilitative function.

## 2. Spotless Disciplinary Record While Incarcerated

Chappell's commitment to following the law did not begin upon his release—he maintained a spotless disciplinary record throughout his incarceration, something that is extremely rare in the federal prison system. He never received a single disciplinary infraction, demonstrating his ability to follow rules and expectations even in an environment where infractions are common.

His strong sense of responsibility was further demonstrated when he received a commendation for assisting a staff member during an emergency. Rather than disregarding the situation or prioritizing self-preservation, he stepped in to help—a clear reflection of his character and commitment to doing the right thing.

Chappell's spotless prison record and history of assisting others, including staff, even in difficult situations, further confirm that he does not require supervision to ensure lawful behavior. Courts have found that an individual's conduct while incarcerated is a relevant factor in determining whether supervision is necessary. *See, e.g., Hale, supra* (granting early termination where the individual maintained a clean prison record and had no history of disciplinary issues).

## 3. Supervised Release Imposes Unintended Obstacles

Chappell acknowledges that internet monitoring is reasonable given his offense, and he fully complies with it. However, the third-party monitoring company has imposed additional restrictions that go beyond what his probation officer requires and serve no legitimate public safety purpose. These restrictions, which his PO has stated he does not agree with but has no power to change, have directly hindered Chappell's

20

ability to operate and grow his business.

A key barrier imposed by the monitoring company is a complete ban on social media, which directly impacts Chappell's ability to market his consulting services. Most individuals seeking guidance in SO cases, including clients and their families, turn to social media for information and resources. YouTube, the second-largest search engine after Google, is a primary platform for legal and prison-related content, yet Chappell is blocked from using it. His inability to post educational and marketing content on YouTube and Facebook limits his ability to reach the very people his business is designed to help.

Beyond these restrictions, the cost of monitoring has become another unjustified barrier. The monitoring company has raised its rates twice in the past year, significantly increasing the financial burden of compliance. This ongoing expense has made it difficult for Chappell to expand his electronic usage at home and in his office, preventing him from making his work processes more efficient. These limitations are not imposed by USPO, nor are they tied to legitimate public safety concerns—they are the result of a third-party company enforcing unnecessary obstacles that restrict Chappell's ability to function professionally.

Supervised release is not intended to impose barriers that make lawful, productive activities more difficult than necessary. Chappell has demonstrated his ability to comply with monitoring requirements, remain law-abiding, and maintain professional stability, yet these added restrictions serve no corrective purpose and actively hinder his reintegration efforts.

21

## 4. Supervised Release is not Intended to be Punishment

Supervised release is not meant to serve as an additional punishment for individuals who have already reintegrated into society. Chappell's long-term stability and clear track record make continued supervision redundant and unjustified.

Chappell's continued supervision serves no rehabilitative or protective function at this point. He has demonstrated that:

- He is fully rehabilitated, having voluntarily completed the most intensive treatment programs available and excelling afterward.
- He has a stable, law-abiding life, eliminating the need for ongoing correctional oversight.
- He needs no assistance from USPO to be successful, in any way.

Given these facts, continued supervision is unnecessary, and the court should grant early termination.

## CONCLUSION

Chappell has fully reintegrated, built a successful business, and maintained long-term financial and personal stability. He voluntarily completed multiple intensive treatment programs, maintained a spotless disciplinary record in prison, and has no history of violations on supervision. Supervised release is meant to assist with reintegration, which has been accomplished in this case. Because Chappell no longer requires supervision, the court should grant early termination.

Respectfully submitted,

February 24, 2025

Date:

Dale Chappell
459 West St.
Rutland, VT 05701
802-404-2750
daleinvermont@gmail.com

23

## CERTIFICATE OF SERVICE

I affirm, under the penalty of perjury, that this document was mailed to the

following on the date below:

United States District Court
P.O. Box 945
Burlington, VT 05402-0945

United States Attorney's Office
P.O. Box 570
Burlington, VT 05402-0570

February 24, 2025

Date:

Dale Chappell
459 West St.
Rutland, VT 05701
802-404-2750
daleinvermont@gmail.com